# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION |
| Plaintiff, | |
| v. | No. 2:13-cr-00039 |
| MICHAEL J. SULLIVAN, <br> MICHAEL LOWRY, <br> ROBERT MULGREW, <br> WILLIE SINGLETARY, <br> THOMASINE TYNES, <br> MARK A. BRUNO, <br> WILLIAM HIRD, <br> HENRY P. ALFANO and <br> ROBERT MOY, | |
| Defendants. | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                 **JULY 1, 2013**

Presently before the Court is Defendant, Michael J. Sullivan's ("Sullivan") Motion to Dismiss, which has been joined in by several of the Defendants, the Response in Opposition filed by the United States of America ("Government"), the Replies filed thereto, and the oral arguments presented during a hearing conducted on June 24, 2013. For the reasons set forth below, we deny the Motion to Dismiss.

## I. INTRODUCTION

This case involves criminal charges resulting from the federal investigation into an alleged widespread ticket-fixing scheme by nine current or former Philadelphia Traffic Court ("Traffic Court") judges. See Indictment. According to the Indictment, the Traffic Court was

used by the alleged conspirators to give preferential treatment to certain ticketholders, most commonly by "fixing" tickets for those with whom they were politically and socially connected. Id. ¶ 1. The Indictment charges that Defendants:

> achiev[ed] favorable outcomes on traffic citations for politically connected individuals, friends, family members, associates, and others with influential positions. This manipulation, or "ticket-fixing," consisted of: (1) dismissing tickets outright; (2) finding the ticketholder not guilty after a 'show' hearing; (3) adjudicating the ticket in a manner to reduce fines and avoid the assignment of points to a driver's record; and (4) obtaining continuances of trial dates to 'judge-shop,' this is to find a Traffic Court judge who would accede to a request for preferential treatment.

Id. ¶ 30. According to the Indictment, "[i]n acceding to requests for 'consideration,' Defendants were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly due as fines and costs." Id. ¶ 38.

The Indictment charges each of the defendants with one count of conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 1349.[1] See id. Additionally, all of the Defendants are charged with multiple counts of wire fraud, in violation of 18 U.S.C. § 1343,[2] and

---

[1]18 U.S.C. § 1349 states:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

18 U.S.C. § 1349.

[2]The wire fraud statute, 18 U.S.C. § 1343, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or

mail fraud in violation of 18 U.S.C. § 1341.[3] In addition, Defendants Michael Lowry ("Lowry"), Robert Mulgrew ("Mulgrew"), and Thomasine Tynes ("Tynes") have been charged with perjury under 18 U.S.C. § 1623. Id. at p. 67-73. Defendants, Willie Singletary ("Singletary") and William Hird have also been charged with making a False Statement to the FBI under 18 U.S.C. § 1001. Id. at p. 74-79. Former Traffic Court Judges Fortunato Perri, Sr. ("Perri"), H. Warren Hogeland ("Hogeland"), and Kenneth N. Miller ("Miller") have pled guilty.

---

> television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

[3]The mail fraud statute, 18 U.S.C. § 1341, provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C.A. § 1341.

## II. BACKGROUND

Sullivan's Motion to Dismiss has been joined in by Defendants Mulgrew, Lowry, Alfano, Moy, Singletary, Bruno, and Hird. (See Doc. Nos. 73, 76, 77, 78, 85, 88, 91.) Defendant Mark A. Bruno ("Bruno") has filed his own Motion to Dismiss, which includes, in part, the same argument set forth by Sullivan.[4] (See Doc. No. 85.) Tynes has filed a First Motion to Dismiss Counts which is based upon a separate and distinct issue. (See Doc. No. 87.) We will consider other arguments for dismissal at a later time.

As previously stated, the Indictment charges each of the Defendants with conspiracy to commit wire and mail fraud under 18 U.S.C. § 1349, wire fraud under 18 U.S.C. § 1343, and mail fraud under 18 U.S.C. § 1341.[5] Defendants move to dismiss the Indictment based upon the argument that the money the Government alleges was lost in fees and costs is not "a property interest because the conduct charged is too inchoate; until a traffic violator has been adjudicated guilty, no fine or cost can be imposed and neither the City of Philadelphia nor the Commonwealth can claim any legal entitlement to any fines or costs arising from the violations." (Sullivan's Mot. to Dismiss at 1-22.) According to Defendant, "[s]imply put, through the Indictment the Government seeks to criminalize alleged violations of state judicial conduct rules; such an improper expansion of federal power should not be allowed." (Id. at 2.)

---

[4] The Court notes that Bruno's Motion to Dismiss will be addressed in accordance with the Scheduling Order dated March 28, 2013.

[5] The same legal analysis applies to both the mail and wire fraud statutes because they share the same relevant language. See Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987) (noting that "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here").

### III. LEGAL STANDARD

"Federal Rule of Criminal Procedure 7(c)(1) requires only that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged." United States v. Huet, 665 F.3d 588, 594 (3d Cir. 2012). "'It is well-established that '[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits.'" Id. at 594-95 (quoting United States v. Vitillo, 490 F.3d 314, 320 (3d Cir. 2007)). The Court of Appeals for the Third Circuit ("Third Circuit") has previously held that "an indictment is facially sufficient if it '(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.'" Id. at 595 (quoting Vitillo, 490 F.3d at 321). "'[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit a defendant to prepare his defense and invoke double jeopardy.'" Id. (citing United States v. Kemp, 500 F.3d 257, 280 (3d Cir. 2007)). "In contrast, if an indictment fails to charge an essential element of the crime, it fails to state an offense." Id. (citing United States v. Wander, 601 F.2d 1251, 1259 (3d Cir. 1979)).

"'Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings to . . . ensur[e] that legally deficient charges do not go to a jury.'" Id. (quoting United States v. Bergrin, 650 F.3d 257, 268 (3d Cir. 2011)). "[T]he scope of a district court's review at the Rule 12 stage is limited." Id. "'[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence.'" Id. (quoting United States v. DeLaurentis, 230 F.3d 659, 660 (3d Cir.

5

2000)). In evaluating a Rule 12 motion to dismiss, the factual allegations set forth in the indictment must be accepted as true by the district court. Id. (citing United States v. Sampson, 371 U.S. 75, 78–79 (1962); United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990)). "'Evidentiary questions - such as credibility determinations and the weighing of proof - should not be determined at this stage.'" Id. (quoting Bergrin, 650 F.3d at 265 (internal marks and citation omitted)). "Thus, a district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged." Id. at 595-96 (citations omitted).

## IV. DISCUSSION

The mail and wire fraud statutes both require the existence of a "scheme or artifice to defraud, or for obtaining money or a property by means of false or fraudulent pretenses." See 18 U.S.C. §§ 1341, 1343. In this case, the question presented is whether the Indictment adequately alleges that Defendants engaged in a scheme to defraud the Commonwealth and the City of money in costs and fees.[6] Upon consideration of all of the arguments, and the extensive caselaw concerning this issue, we conclude that it does.

### A. *Supreme Court Cases*

In order to come to this conclusion, a summary of the following four main Supreme Court cases interpreting the phrase "money or property interest" in the mail and wire fraud statutes is instructive: McNally v. United States, 483 U.S. 350 (1987), superseded by statute, 18 U.S.C.

---

[6] Originally, the Government argued that the ticket-pricing scheme deprived the Commonwealth of property in the form of its ability to regulate safe drivers on the roadways through licensing suspensions and revocations. See Indictment. The Government abandoned this theory in its Response to Sullivan's Motion to Dismiss. (Govt.'s Response to Defs.' Mot. to Dismiss at 18 n.12.)

6

§ 1346; Carpenter v. United States, 484 U.S. 19 (1987); Cleveland v. United States, 531 U.S. 12 (2000); and Pasquantino v. United States, 544 U.S. 349 (2005).

   *1. McNally v. United States*

McNally involved a former public official of the Commonwealth of Kentucky, and a private individual, who were involved in a self-dealing patronage scheme involving commissions and premiums paid on awarding insurance coverage for the State. 483 U.S. at 353-355. The defendants were charged with, and convicted of, violating Section 1341 by devising a scheme to defraud the citizens and government of Kentucky of their "intangible right" to have the Commonwealth's affairs conducted honestly. Id. at 352.

Notably, the McNally Court pointed out that "as the action comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property." McNally, 483 U.S. at 360. Thus, the Supreme Court was asked to determine whether the deprivation of "honest services" fell within the scope of the mail fraud statute. The Supreme Court decided that Section 1341 must be read "as limited in scope to the protection of property rights."[7] Id. at 360. Importantly, the McNally Court held that the mail fraud statute did not reach "the intangible right of the citizenry to good government." Id. at 356. As such, the Court held that a scheme to deprive the Commonwealth of Kentucky of "honest services" was not within the scope of Section 1341 and, therefore, reversed the defendants' convictions. Id. at 361.

---

[7] In response to the McNally decision, Congress enacted 18 U.S.C. § 1346, which defines "a scheme or artifice to defraud" to include not only a scheme that deprives the victim of money or property, but also "a scheme or artifice to deprive another of the intangible right to honest services." See 18 U.S.C. 1346. In Skilling v. United States, 130 S. Ct. 2896, 2931 (2010), the Court held that such "honest services" fraud encompasses only bribery and kickback schemes. A violation of Section 1346 is not alleged in the Indictment.

## 2. *Carpenter v. United States*

In the same year as its McNally decision, the Supreme Court decided Carpenter v. United States. 484 U.S. 19. The Carpenter Court applied Section 1341 to intangible property rights. Id. at 25. In Carpenter, the defendant was alleged to have violated Section 1341 by defrauding the Wall Street Journal (the "Journal") of "confidential business information." Id. at 24. One Defendant was a reporter for the Journal and wrote a regular column discussing selected stocks and giving positive and negative information about those stocks. The Journal had a policy setting forth that before the publication of each column, the contents of the column were the Journal's confidential information. Id. at 23. Against this policy, the defendant entered into a scheme by which he gave employees of a brokerage firm advance information as to the timing and contents of the column. Then, those brokers traded on the prepublication information.

The reporter and the brokers were charged with violations of securities laws and the mail and wire fraud statutes. The specific issue addressed by the Supreme Court was whether the contents of the Journal column, which were fraudulently misappropriated by the reporter, constituted "money or property" under the mail and wire fraud statutes in light of McNally. Distinguishing the case from McNally, the Court held that as defendant's employer, the Journal, "was defrauded of much more than its contractual right to [defendant's] honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights.'" Id. at 25 (citing McNally, 483 U.S. at 359 n.8). The Court focused on the fact that the object of the scheme was to take the Journal's confidential business information, and determined that its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. Id. The Court stated

8

that "McNally did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." Id. at 25. Reasoning that "confidential business information has long been recognized as property," the Court concluded that the Journal "had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of [its] column." Id. at 26 (citations omitted).

In coming to its conclusion, the Court rejected the argument that a scheme to defraud required a monetary loss; instead, holding that "it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." Id. at 26-27. The Court also rejected the argument that defendant's conduct amounted to no more than a violation of workplace rules and did not constitute fraudulent activity. Relying upon its prior opinion in McNally, the Court concluded that "the words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes.'" Id. at 27.

### 3. Cleveland v. United States

In 2000, the Supreme Court decided Cleveland, which involved a defendant who was charged and convicted of violating the mail fraud statute by making false statements in applying to the Louisiana State Police for a license to operate video poker machines. 531 U.S. at 15. The Supreme Court specifically addressed the issue of whether the pre-issued Louisiana video poker license qualified as "property" within the scope of § 1341. Id. In deciding this issue, the Court held that "[i]t does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the

hands of the victim." Id. at 15. Accordingly, the Supreme Court went on to consider "whether a government regulator parts with 'property' when it issues a license." Id. at 20.

In analyzing this issue, the Court first noted that the "core concern" for Louisiana in issuing licenses was regulatory, and, as such, Louisiana law established a typical regulatory program for issuing video poker licenses. Id. at 20-21. Also, the Court noted that the pre-issued licenses sought "do not generate an ongoing stream of revenue" and "the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law." Id. at 22. Regarding the government's argument that the state had a right to choose to whom it would award a license, the Court responded that this was not a property right, but an intangible right; namely, the power to regulate. Id. at 23. Concluding that the video poker license at issue was not property in the hands of the State of Louisiana, the Court reversed defendant's conviction because the conduct did not fall within the scope of the mail fraud statute.

### 4. Pasquantino v. United States

In Pasquantino, defendants were convicted of wire fraud in connection with a scheme to evade Canadian liquor importation taxes by smuggling liquor from the United States into Canada. 544 U.S. at 355. The Supreme Court held that "an entitlement to collect money from [a party]" is money or property under the mail and wire fraud statutes. Id. The Court found that the defendants were attempting to "deprive Canada of money legally due," and that "Canada's right to uncollected excise taxes . . . is 'property' in its hands." Id. at 355-56.

## B. Analysis of Case

Against this background, accepting as true the Government's factual allegations in the Indictment, we find that the Indictment tracks the express language of the statutes and

unambiguously states the elements that constitute the offenses charged. Specifically, we find that the Indictment charges Defendants with committing acts which caused a monetary or property loss to the Commonwealth and the City. Therefore, Defendants' Motion to Dismiss is denied.

Although Defendants argue that the alleged fraud by Defendants did not deprive the Commonwealth or the City of "money or property," the Indictment specifically alleges that the ticket-fixing scheme defrauded the Commonwealth and the City of funds to which they were entitled. Regarding the "money or property" requirement of the mail and wire fraud statues, the Indictment alleges, in relevant part, as follows:

> 1. The conspirators used the Philadelphia Traffic Court ("Traffic Court") to give preferential treatment to certain ticketholders, most commonly by "fixing" tickets for those with whom they were politically and socially connected. By doing so, the conspirators defrauded the Commonwealth of Pennsylvania and the City of Philadelphia of funds to which the Commonwealth and the City were entitled.
>
> \*     \*     \*     \*     \*
>
> 5. The Traffic Court judges presided over and adjudicated moving violations, commonly referred to as traffic tickets or citations, occurring within Philadelphia, issued by the Philadelphia Police Department and the Pennsylvania State Police, and other police entities. Traffic Court was responsible for the collection of fines and court costs resulting from guilty pleas and findings of guilt for violations of the Pennsylvania Motor Vehicle Code.
>
> 6. On a daily basis, ticketholders appeared before the Traffic Court judges for their trials. It was not uncommon for a Traffic Court judge to preside over dozens of trials in one session. The trials involved an appearance by the ticketholder contesting his or her guilt and either an officer from the Philadelphia Police Department, a State Trooper, or another law enforcement officer, who prosecuted the ticket.
>
> 7. Traffic Court judges had several options when disposing of citations, including finding the ticketholder guilty of a different

offense, guilty, not guilty, not guilty in absentia, guilty in absentia, guilty with a reduction in speed, and dismissal. In addition, the ticketholder could engage in a plea bargain with the police officer or state trooper or other law enforcement officer.

8. Guilty adjudications subjected a violator to statutorily determined fines and costs of court.[8]

9. The moneys received from the fine portion of a guilty adjudication were equally divided between the City and the Commonwealth of Pennsylvania.

10. Upon an adjudication of not guilty or dismissal, the ticketholder did not pay any fines or costs.

\*     \*     \*     \*     \*

27. From in or about July 2008 to in or about September 2011 . . . Defendants . . . conspired and agreed . . . to commit offenses against the Unites State, that is

> (a) to devise and intend to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and, for the purpose of executing the scheme and artifice and attempting to do so, place in a post office or authorized depository for mail matter, matter to be sent or delivered by the Postal Service.
>
> (b) to devise and intend to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and, for the purpose of executing the scheme and artifice, transmit or cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, and sounds.

\*     \*     \*     \*     \*

30. In order to provide the requested preferential treatment, Defendants . . . used their positions at Traffic Court to manipulate Traffic Court cases outside of the

---

[8] According to the Government, "the amount of the fine and the costs are statutorily mandated, and not within the discretion of the court." (Govt.'s Response Defs.' Mot. to Dismiss at 14.) The Government states "[i]n the instant case, there is no discretion as to the imposition of fines and costs once a finding of guilt is made." (Id.)

> judicial process, thereby achieving favorable outcomes for politically connected individuals, friends, family members, associates, and others with influential positions. This manipulation, or "ticket-fixing," consisted of (1) dismissing tickets outright; (2) finding the ticketholder not guilty after a 'show' hearing; (3) adjudicating the ticket in a manner to reduce fines and avoid the assignment of points to a driver's record; and (4) obtaining continuances of trial dates to 'judge-shop,' this is to find a Traffic Court judge who would accede to a request for preferential treatment.
>
> \*      \*      \*      \*      \*
>
> 34. When Traffic Court engaged in "ticket-fixing," they nevertheless reported the final adjudication to the various authorities . . . as if there had been a fair and open review of the circumstances.
>
> \*      \*      \*      \*      \*
>
> 38. In acceding to requests for "consideration," defendants were depriving the City of Philadelphia and the Commonwealth of Pennsylvania of money which would have been properly due as fines and costs.

See Indictment.

Additionally, the Overt Acts section of the Indictment specifically names particular citations that were issued and adjudicated, according to the Government, extra-judicially in furtherance of the traffic-fixing conspiracy. Id. at p. 20-57. The Government includes the specific monetary amounts of the statutory fees and costs associated with the moving violations cited in the tickets, and the adjudications resulting in no fees or costs being assessed. Id. Taking the Government's factual allegations as true, we find that the Defendants' alleged conspiracy involved defrauding the Commonwealth and the City of money. See United States v. Granberry, 908 F.2d 278, 280 (8th Cir. 1990) ("Money is money, and 'money' is specifically mentioned in the statutory words [of Section 1341.]")

In his Reply Brief, Sullivan agrees that the right to statutorily required fees and costs is a property interest, but argues that this is not so in this case because the right to fines here is

triggered only by a guilty adjudication. (Sullivan's Reply at 4.) Sullivan further asserts that "anything short of guilt results in no right to collect any fine or cost from the traffic defendant." (Id.) Sullivan argues that "until an assessment has been imposed any property interest is too attenuated to be the basis of a mail or wire fraud violation." (Id. at 5.) Sullivan's argument, however, fails under the specific facts of this case because the Indictment charges Defendants with the object of the alleged fraud as being the prevention of guilty adjudications; thereby, resulting in statutorily required fees and costs not being assessed or paid to the Commonwealth and the City. It is the fact that the specific tickets at issue did not result in guilty adjudications with fees and costs which is at the heart of the entire "ticket-fixing" scheme alleged in the Indictment. The crux of the Government's conspiracy claim is Defendants' unique ability to prevent guilty adjudications that allows them to give preferential treatment to certain ticketholders for those with whom they were politically and socially connected. In this case, Defendants are in the unique position of being Traffic Court judges who have the power and, according to the Indictment, used such power to not permit the adjudication of specific traffic citations as guilty with fees and costs. Finding in favor of Defendants' argument that the Commonwealth and the City have not suffered economic harm because the right to fees and costs here is only triggered by a guilty adjudication, an assessment or deficiency being imposed, is circular in the context of this case. To accept Defendants' argument would permit the alleged conspirators in this case to enter into a scheme to commit fraud and then hide behind the argument that the success of their fraud precludes prosecution under the "money or property interest" requirement of the mail and wire fraud statutes.

      Additionally, we point out that the Indictment alleges that Defendants conspired and

schemed to prevent the payment of actual fines, not merely potential fines. (Govt.'s Response Mot. to Dismiss at 8.) Defendants argue that, "[a]t most, the City and Commonwealth have a potential entitlement to collect a fine that might be assessed at a future point, but such a speculative property interest by definition is not 'property in the [government's] hands.'" (Sullivan's Mot. to Dismiss at 2.) Regarding the Indictment before us, Defendants' argument misses the mark because the Indictment does not address traffic citations awaiting adjudication, but addresses traffic citations that have been adjudicated. Adjudicated, argues the Government, pursuant to a conspiratorial scheme designed to prevent guilty rulings resulting in the payment of fines.

Defendants' argument implies that the Government has to prove that the Commonwealth and the City were actually deprived of money or property. This is not required. The relevant inquiry concerns what Defendants intended - not whether the Commonwealth and the City were *actually* deprived of money or property. See United States v. Tulio, 263 F. App'x. 258, 261 (3d Cir. 2008).

The Government asserts that "in this case, the Government has alleged and will prove . . . a scheme to prevent the entry of guilty verdicts which the Defendants believed would otherwise occur, and therefore an intent and scheme to deprive the City and Commonwealth of actual funds." (Govt.'s Response Defs.' Mot. to Dismiss at 18.) The Government submits that the overwhelming evidence of ticket-fixing referenced in the Indictment, and which will be presented at trial, will prove that Defendants took part in a scheme to deprive the City and the Commonwealth of money which would have been properly due as fines and costs. Id. at 11. In light of the allegations in the Indictment, it is conceivable that the Government will be able to

produce evidence that Defendants violated the mail and wire fraud statutes by devising a scheme to obtain money. Whether the Government will successfully prove its case is not at issue here. However, at this time, a review of the Indictment shows that the Government sufficiently alleged that Defendants intended to deprive the Commonwealth and the City of money or property.

There is some discussion by Defendants that the statutory fees and costs owed pursuant to a guilty adjudication are regulatory, as opposed to revenue-enhancing. In Cleveland, the Supreme Court balanced the regulatory against the revenue-collecting aspects of the video poker licensing scheme describing the State's "core concern" in pre-issued video poker licenses is "regulatory" despite the fact that the State argued that it "receives a substantial sum of money in exchange for each license and continues to receive payments from the licensee as long as the license remains in effect." 531 U.S. at 20-22. The Cleveland Court focused on the fact that licenses pre-issuance do not generate an on-going stream of revenue for Louisiana. Id. at 22. In so finding, the Court stated that:

> Tellingly, as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law. Indeed, there is no dispute that [defendant's family limited liability partnership] paid the State of Louisiana its proper share of revenue, which totaled more than $1.2 million, between 1993 and 1995. If Cleveland defrauded the State of 'property,' the nature of that property cannot be economic.

Id. The Court found that Louisiana's interests in licensing video poker operations implicates the Government's role as sovereign, not as property holder. Id. at 24.

The Court concluded that "§ 1341 requires the object of the fraud to be 'property' in the victim's hands and that a Louisiana video poker license in the State's hands is not 'property'

16

under § 1341." Id. at 26-27. The Government's argument that Louisiana had a property interest in its licenses simply due to the significant amounts of money it receives in exchange for each license, as well as from the licensee as long as the license remains in effect, was rejected by the Court. Id. Acknowledging that Louisiana had a substantial economic stake in the video poker industry, and that Louisiana does not run any video poker machinery, the Court noted that "[t]he State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees." Id. at 22. The Court pointed out that "[l]icenses pre-issuance do not generate an ongoing stream of revenue." Id. "At most, they entitle the State to collect a processing fee from applicants for new licenses." Id. The Court stated that "[w]ere an entitlement of this order sufficient to establish a state property right, one could scarcely avoid the conclusion that States have property rights in any license or permit requiring an upfront fee, including drivers' licenses, medical licenses, and fishing and hunting licenses." Id.

We note that monetary loss was not involved at all in the offense underlying the conviction in Cleveland. Significantly, monetary loss is alleged, and involved, in this case. The interest of the Commonwealth and the City in statutorily required fees and costs concerning traffic citations in this case implicates their role as property holders, not sovereigns. The fact that the Commonwealth and the City were prevented from receiving those fees and costs due to the alleged conspiracy does not result in a finding that they, therefore, were not property in the hands of the Commonwealth and the City.

Our finding that the Indictment advances theories of mail and wire fraud liability comport with the Supreme Court's decisions in McNally, Carpenter, Cleveland and Pasquantino. The Indictment alleges that the object of Defendants' fraud was money or a property right, not simply

17

an intangible right unrelated to money or property. See McNally, 483 U.S. at 2879 ("The mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government."); Carpenter, 484 U.S. at 26 ("Sections 1341 and 1343 reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises."); Cleveland, 531 U.S. at 26 ("§ 1341 requires the object of the fraud to be 'property' in the victim's hands."); Pasquantino, 544 U.S. at 355 ("The object of petitioner's scheme was to deprive Canada of money legally due, and their scheme thereby had as its object the deprivation of Canada's 'property.'")

Other than the Carpenter decision, which is distinguishable from our case because it addresses intangible property rights, McNally, Cleveland and Pasquantino all addressed whether or not the indictments at issue charged that the Government was defrauded of any money or property. See McNally, 483 U.S. at 360 ("We note that as the actions comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property."); Cleveland, 531 U.S. at 2 ("[T]he Government nowhere alleges that Cleveland defrauded the State of any money."); Pasquantino, 544 U.S. at 357 (differentiating Cleveland stating "[h]ere, by contrast, the Government alleged and proved that petitioners' scheme aimed at depriving Canada of money to which it was entitled by law"). We make note of this because the Indictment at hand specifically charges that the alleged scheme under the mail and wire fraud statutes was designed to defraud the Commonwealth and the City of money. Given the unique circumstances of the kind involved here, which include allegations of corrupt Traffic Court judges preventing the adjudication of guilty verdicts resulting in fees and costs being owed and paid to the Commonwealth and the City, we conclude that the Government has

18

sufficiently alleged that the object of Defendants' scheme was to deprive the Commonwealth and the City of money or property.

## V. CONCLUSION

Although the Third Circuit has not yet had an opportunity to consider the "money or property" theory in the Indictment, this Court is confident that if the issue was before it, it would reject the narrow and circular approach taken by Defendants in favor of an approach examining the Indictment as a whole, and affirm the validity of the indictment due to the legitimate property interests clearly at stake. As the Third Circuit explained in United States v. Asher, 854 F.2d 1483, 1494 (3d Cir. 1988), "[w]hile we recognize that cases may fall on either side of the McNally/Carpenter line, those cases that have sustained mail fraud convictions have done so where the 'bottom line' of the scheme or artifice had the inevitable result of effectuating monetary or property losses to the employer of or the state." Accepting the factual allegations in the Indictment as true, we find that the Government has alleged the "bottom line" of the charged scheme as having the result of effectuating a monetary or property loss to the Commonwealth and the City. Accordingly, dismissal of the Indictment is not warranted.

An appropriate Order follows.